# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **BRIAN ALLAN GUIDRY** | * | **CIVIL ACTION NO. 15-1857** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE WHITEHURST** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Brian Allan Guidry, born in 1971, filed an application for a period of disability and disability insurance benefits on September 19, 2007, alleging disability as of March 31, 2007,[1] due to panic attacks and anxiety.[2]

On February 11, 2009, the Administrative Law Judge ("ALJ") conducted a hearing, after which he issued an unfavorable decision on April 22, 2009. (Tr. 156-66). On April 1, 2011, the Appeals Council vacated the decision and remanded the case for a new hearing. (Tr. 152-55).

On September 28, 2011, the ALJ held a second hearing. (Tr. 62-88). On November 18, 2011, he issued an unfavorable decision. (Tr. 167-82). On November 15, 2012, the Appeals Council again vacated the ALJ's decision and remanded the claim for a new hearing. (Tr. 183-86).

---

[1] Claimant amended his onset date from December 31, 1998 to March 31, 2007. (Tr. 15).

[2] Claimant acquired sufficient quarters of coverage to remain insured through September 30, 2009. (Tr. 15). Thus, he must establish disability on or before that date. *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir.1990).

The third hearing was held on May 21, 2013, after which the ALJ issued another unfavorable decision on July 9, 2013.  (Tr. 187-206).  On review, the Appeals Council vacated the ALJ's decision and remanded claimant's case for a third time.  (Tr. 207-10).

On August 8, 2014, another ALJ presided over claimant's fourth hearing.  (Tr. 123-49). On February 25, 2015, she issued an unfavorable decision.  (Tr. 12-33).  On April 22, 2015, the Appeals Council denied review.  (Tr. 1-6).

On June 11, 2015, claimant filed an action for judicial review with this Court.

## I. STANDARD OF REVIEW

The Court limits its review of a denial of disability insurance benefits to two issues: (1) whether the Secretary applied the proper legal standards, and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1988).

The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971).  Substantial evidence is defined as more than a mere scintilla.  *Id.*, 402 U.S. at 401, 91 S.Ct. at 1427.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id*.

The Court may not, however, reweigh the evidence or substitute its judgment for that of the administrative fact finder.  *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).  If substantial evidence supports the administrative finding, the Court may then only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations.  *Id*. at 393.

2

## II. BURDEN OF PROOF

Disability is defined as " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  The existence of such disability must be demonstrated by medically acceptable clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant.  *Cook*, 750 F.2d at 393.

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled.  *Ramirez v. Colvin*, 606 F. App'x 775, 778 (5th Cir. 2015).  The steps include: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof is on the claimant at the first four steps.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The burden of proof shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can perform.  *Fraga v. Bowen*, 810 F.2d 1296, 1301-02 (5th Cir. 1987).  If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that he could not perform the alternative work identified.  *Id*. at 1302.  Throughout the process, the ultimate burden of establishing disability remains with the claimant.  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

3

## III. ANALYSIS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is supported by substantial evidence, based on the following:

## A. Medical Evidence

Claimant chiefly complains of mental impairments including major depressive disorder, generalized anxiety disorder, panic disorder and bipolar disorder.  Dr. Cousin, a family practitioner, began treating him in 2007 for various ailments, particularly panic attacks and depression.  (Tr. 559-63).  His diagnosis was bipolar disorder.  Dr. Cousin prescribed Xanax, Effexor XR, Zyprexa, and Alprazolam (Xanax).

On December 14, 2007, Kelly Ray, Ph.D., completed a Psychiatric Review Technique for Disability Determination Services ("DDS"), in which she found that claimant had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 587).  In the Mental Residual Functional Capacity ("RFC") Assessment, Dr. Ray determined that claimant was not significantly limited as to understanding and memory; was moderately limited in his ability to work in coordination with or proximity to others without being distracted, and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and was markedly limited as to his ability to interact

4

appropriately with the general public.  (Tr. 591-92).  She found that he could perform at least simple to moderately detailed routine work at a low level of responsibility which did not require extensive cooperation with others.  (Tr. 593).

On December 13, 2007, David Greenway, Ph.D., conducted a consultative psychological evaluation at the request of DDS.  (Tr. 572-74).  Claimant complained of social anxiety and panic attacks.  (Tr. 573).  While he informed Dr. Greenway that he had good social functioning with his parents, brother, and family members, he said that he was moderately socially affiliative and did not like crowds.  (Tr. 572).

Claimant had been arrested twice for DWI.  (Tr. 573).  He admitted to a past problem with alcohol, but reported that he had been abstinent for the past year.  His medications included Effexor, Zyprexa, Alprazolam and Hydrochlorothiazide (HCTZ).

On examination, claimant exhibited no symptoms of psychosis.  His verbal behavior was of normal rate and volume.  He had no sensory or motor handicap.  Psychomotor activity was normal.  He had no evidence of a formal thought disorder.

Claimant had no difficulty with language or speech.  His receptive skills were good.  His affective expression was somewhat sad and restricted.  His insight was limited with poor judgment.

Claimant exhibited adequate social skills.  (Tr. 574).  His attention and concentration were within the lower bounds of normal limits.  His recent and remote memories appeared intact. Behavioral pace was fair with consistent effort.

Claimant's intellectual functioning was estimated to be in the low average range.  His cognitive skills were adequate to understand, remember and carry out fairly detailed instructions,

5

and to maintain attention to perform simple repetitive tasks for two-hour blocks of time.  Dr.
Greenway believed that claimant's ability to tolerate stress, sustain effort and persist at a normal
pace over the course of a routine 40-hour workweek was fair.  While his social skills were
adequate, claimant reported significant social anxiety and avoidance of social situations.

Dr. Greenway's diagnoses were anxiety disorder and depression.  He assessed claimant
with a Global Assessment of Functioning ("GAF") score[3] of 60 with mild to moderate neurotic
symptoms and some difficulty in social and occupational functioning.  He was socially stable in a
long-term marriage.

Claimant returned to Dr. Cousin on February 28, 2008, for lab work and treatment of
hypertension, cholesterol and diabetes.  (Tr. 596-604).  His medications included
Hydrochlorothiazide (high blood pressure), Xanax (anxiety and panic disorder), Cymbalta
(depression and anxiety), Zyprexa (bipolar disorder and depression), Glucophage (dabetes),
Simvastatin (choleterol and triclycerides), and Niravam (Alprazolam) (anxiety and panic
disorder).  (Tr. 596).

At the request of claimant's attorney, claimant saw Naomi Friedberg, Ph.D., for a mental
status evaluation on July 28, 2008.  (Tr. 606).  He had some difficulty interacting with Dr.

---

[3]The GAF scale is no longer included in the DSM-V.  *Spencer v. Colvin*, 2016 WL 1259570, at *6 n. 8
(W.D. Tex. Mar. 28, 2016); *Locure v. Colvin*, 2015 WL 1505903, at *10 (E.D. La. April 1, 2015) ("both the
American Psychiatric Association and the Commissioner have recently decided that GAF scores are not helpful in
either medical or disability decision-making.");  *White v. Colvin*, 2013 WL 4413335, at *1 (S.D. Tex. Aug. 12,
2013).  However, the SSA published internal instructions regarding how to continue interpreting GAF scores that
appear in medical records, noting that such scores should be treated as opinion evidence.  *Jackson v. Colvin*, 2015
WL 7681262 at *3 (N. D. Tex. Nov. 5, 2015).  The SSA further instructed that, " '[a]s with other opinion evidence,
the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental
functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the
claimant, and the rater's expertise.' "  *Harris-Nutall v. Colvin*, 2016 WL 3906083, at *5 (N.D. Tex. July 19, 2016)
(*quoting Jackson*, at *3).

Friedberg, as his anxiety was apparent.  His mood and affect were irritable and depressed, and he appeared to be cautious and somewhat suspicious of her.

Claimant reported significant anxiety with panic attacks, significant depression, and a history of bipolar disorder.  (Tr. 607).  He reportedly used to drink alcohol excessively, but had been sober for two years.  He had been arrested for trespassing and two OWIs (operating vehicle while intoxicated).  (Tr. 608).

Claimant complained of crying spells and social isolation, but admitted repairing motorcycles for friends, performing construction remodeling work for his wife, who was self-employed as a home decorator, and doing some household chores for his wife when she was at work.  (Tr. 607-08).  His medications included Zyprexa (bipolar disorder), Xanax, Cymbalta, Metformin (diabetes), HCTZ and Simvastatin.  (Tr. 608).  He had never received any mental health treatment.

On review of findings and history, Dr. Friedberg diagnosed claimant with generalized anxiety disorder, panic disorder, major depressive disorder, a history of a bipolar disorder diagnosis, and alcohol dependence in reported full remission.  (Tr. 609).  She found claimant's ability to understand, remember and carry out simple instructions to be generally intact.  His ability to understand, remember and carry out moderate and detailed instructions appeared to be negatively impacted by his depression with significant anxiety and frequent panic attacks.  Claimant's ability to understand, remember and carry out more difficult tasks and instructions was impacted by his poor social skills and social avoidance.  Additionally, Dr. Frieberg found hindrances from cognitive deficits and somewhat lowered intellectual and adaptive functioning.

7

Dr. Friedberg opined that claimant's ability to maintain attention to perform simple repetitive tasks over a two-hour block of time, sustain effort and persist at a normal pace over the course of a routine workweek would be negatively impacted by his above-stated difficulties.  She noted that claimant's past diagnosis of bipolar disorder was "somewhat questionable," as he did not appear to have a consistent history of such symptoms.  She found his social functioning, judgment and ability to control his impulsivity to be extremely poor.

Claimant was seen by Dr. Cousin from August 6, 2008 through September 23, 2008, for lab work and treatment of hypertension and diabetes.  (Tr. 615-20).  On April 8, 2009, he had a lab review and complained of heart palpations.  (Tr. 636).  On June 16, 2009, Dr. Cousin reported that he was doing very well on Zyprexa.  (Tr. 635).

After claimant's date last insured on September 30, 2009, he saw Dr. Cousin on December 11, 2009, for a panic attack.  (Tr. 633).  He did not see Dr. Cousin again until July 23, 2010 for a lab review, and reported having a panic attack.  (Tr. 631).  On March 16, 2011, Dr. Cousin noted that the "Zyprexa does level him out pretty good."  (Tr. 626). On April 15, 2011, claimant complained of nausea from his medication and anxiety.  (Tr. 625).

On October 29, 2012, claimant stated that he had urges to hurt himself and others, but did not think that he would act on the impulses.  (Tr. 639).  His depression/anxiety had been relatively well-controlled until about three months prior.  He had been out of Cymbalta for a month, with symptoms worsening.  Dr. Cousin increased his Zyprexa and resumed Cymbalta.  (Tr. 640).

On November 19, 2012, claimant was seen for generalized anxiety disorder and mood disorder.  (Tr. 638).  Dr. Cousin found that claimant's anxiety and stress seemed to be improved.

8

His blood pressure was a little bit elevated.  Dr. Cousin noted that his office had helped him fill

out papers for free samples from the pharmaceutical companies.

On May 14, 2013, Dr. Cousin noted that claimant had not been there since November 19,

2012.  (Tr. 649).  He stated that claimant had not been taking his anti-hypertensive medications,

and needed to get back on them.  He observed that claimant had been treated since August 2007

for anxiety disorder with panic, mood and depressive disorder, and had achieved substantially

better control of these problems with more recent medication changes.

Dr. Cousin stated that claimant needed to work toward better control of his problem,

which could be approached with counseling and therapy or newer medications.  (Tr. 650).  He

noted that claimant was unable to do these things because he had no resources and was unable to

work.  He observed that since the first time that he saw claimant in 2007, he was "substantially

and completely unable to hold any type of gainful employment," and that his panic disorder,

mood disorder and resultant irritability "precluded his ability to hold any job."  He opined that

claimant continued to manifest the same characteristics, "although they are a bit better controlled

now."  He concluded that claimant "still has a long way to go before any gainful employment

could be considered."

On May 14, 2013, Dr. Cousin completed a Mental Functional Capacity Assessment, in

which he completed a checklist regarding claimant's mental impairments.  (Tr. 653-58).  He

checked that claimant had limitations likely to occur more than 50% of the workweek as to

remembering locations and work-like procedure; understanding and remembering detailed

instructions; performing activities within a schedule, maintaining regular attendance, and being

punctual within customary tolerances; sustaining an ordinary routine without special supervision;

working coordination with or proximity to others without being distracted by them; completing a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in a work setting.  (Tr. 653-54).

Additionally, Dr. Cousin filled in blanks that claimant had "moderate" restriction of activities of daily living, "marked" difficulties in maintaining social functioning, and "marked" difficulties in maintaining concentration, persistence or pace.  (Tr. 655).  He also circled "Yes" to repeated episodes of decompensation, each of extended duration, resulting in complete inability to function independently outside the area of his home.

On March 18, 2014, Dr. Cousin wrote a letter in which he stated that claimant: "is being treated for several medical conditions and is completely disabled and unable to work."  (Tr. 663).  On July 28, 2014, he wrote that claimant continued to suffer from severe anxiety, panic, mood disorders and depression, and that he could not rule out a bipolar disorder.  He stated that claimant's disorders and irritability made it "impossible for him to maintain gainful employment."  (Tr. 666).

On July 2, 2014, Dr. Cousin noted that claimant had changed to Zoloft, and it "seem[ed] to be doing ok."  (Tr. 667).  He also observed that claimant was "looking pretty good now." He continued the same medications.  (Tr. 668).  Dr. Cousin reported that he was going to price the Medicare fees for the labs so that claimant could decide if he could afford them.

On October 22, 2014, Dr. Cousin stated that claimant had a "profound mood dysfunction and is not able to maintain gainful employment."  (Tr. 673).  He opined that he considered

10

claimant to be "fully disabled," and that he would "never be able to work for any employer."

## B. Hearing Testimony

At the hearing on August 8, 2014, claimant was 43 years old.  (Tr. 132, 137).  He testified that since his divorce, he had lived with his mother and took care of her. (Tr. 129, 137).  He reported that he was 5 feet 7 inches tall and weighed 155 pounds, and that his weight had fluctuated after his divorce from 170 to 130 pounds.  (Tr. 130).

Claimant attended school until the ninth grade, which he failed.  He was in special education classes.  He had past work experience as a construction helper, small engines mechanic, forklift operator and painter.  (Tr. 132, 142).

As to complaints, claimant testified that he first had a panic attack while working in 1998 at Gary's Paint & Body.  (Tr. 131).  He had been having panic attacks three or four times a week or sometimes per day since 2007.  (Tr. 133-34).  He also complained of severe depression.  (Tr. 135).

Claimant stated that he was being treated by Dr. Cousin.  (Tr. 140).  He reported that he was not seeing him that often because he did not have the money to make the appointments.  He said that he had been hospitalized only once in 1998 when he thought he was having a heart attack, which turned out to be a panic attack.  (Tr. 141).

Regarding activities, claimant did his mother's household chores, including yard work such as mowing the lawn at least six hours a week.  (Tr. 135-36).  He also went to a friend's house on the Henderson Levy.  (Tr. 135).

Jeanne Tarver testified as a vocational expert ("VE").  She classified claimant's past work as a motor boat mechanic as heavy with a Specific Vocational Preparation ("SVP") of 7;

11

sandblaster as medium with an SVP of 2; painter as medium with an SVP of 7; paperhanger as medium with an SVP of 7; forklift operator as medium with an SVP of 3, and construction worker as heavy with an SVP of 4.  (Tr. 143).  The ALJ posed a hypothetical in which she asked the VE to assume a claimant with the same work history, who had no exertional limitations, but was limited to unskilled work activity, specifically, simple, routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes; to no more than occasional interaction with co-workers and the general public, and to work more with objects rather than people.  (Tr. 143-44).  In response, Ms. Tarver testified that the only prior job that he could perform was sandblaster, but he could also work as a bagger, of which there were 328,546 jobs nationally and 2,032 statewide; laundry classifier, of which there were 132,469 jobs nationally and 1,560 statewide, and price marker, of which there were 222,084 jobs nationally and 2,884 statewide.  (Tr. 144-45).

When claimant's attorney changed the hypothetical to add another limitation that such claimant would require three unscheduled breaks per week, 30 minutes in duration, due to anxiety symptoms, the VE testified that such person could not perform those jobs.  (Tr. 145-46).  Additionally, when he changed the hypothetical to assume an individual who was unable to maintain attention for two-hour blocks of time for 20 percent of the workweek, or approximately eight hours out of 40, Ms. Tarver responded that such individual would not be able to maintain employment.  (Tr. 146).  Further, when he changed the judge's hypothetical to assume that claimant would miss three days per month due to medical impairments, the VE testified that such person would not be able to maintain employment.  Finally, when the attorney asked if claimant could maintain employment if he needed one 15-minute unscheduled break per day in addition to

12

normally scheduled breaks due to anxiety symptoms, the VE testified that he would not.  (Tr. 147).

## C. Argument

Claimant argues that the ALJ failed to properly evaluate Dr. Cousin's treating source opinions regarding his functional abilities during the period from March 31, 2007 (his amended disability onset date) through September 30, 2009 (his date last insured); the AJL improperly applied controlling law, and her evaluation of the medical opinion evidence is not supported by substantial evidence.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  . . .  other substantial evidence." *Newton*, 209 F.3d at 455 (*citing* 20 C.F.R. § 404.1527(d)(2)).

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan*, 38 F.3d at 237.

Claimant argues that the ALJ failed to properly evaluate the treating opinions of Dr. Cousin, who treated him during the period before his date last insured ("DLI") and after his DLI.

13

[rec. doc. 11, p. 8].  The ALJ stated that since the issue was whether claimant was disabled on or before September 30, 2009, she would concentrate on the medical evidence pertaining to this period, "*especially to the treating source assessment by Dr. Cousin that is entered into the record as Exhibit 13-F* [Mental Functional Capacity Assessment dated May 14, 2013]," as well as "to any *additional evidence that was submitted after the decision issued on July 9, 2013*."  (Tr. 20, 651-58).  This belies claimant's assertion that the ALJ failed to consider Dr. Cousin's updated reports.

Additionally, claimant asserts that the ALJ's reason for discounting Dr. Cousin's opinions due to lack of formal health treatment is without merit.  [rec. doc. 13, p. 3].  The ALJ noted that Dr. Cousin "never recommended mental health services, counseling, psychotherapy, inpatient or outpatient psychiatric treatment, *etc*." . . . and "never admitted claimant to a hospital under a Physician's Emergency Certificate ("PEC") at any time on or before his DLI.  (Tr. 20).  Later in her decision, the ALJ reiterated that Dr. Cousin "did not order any inpatient psychiatric treatment, any intense psychiatric treatment, or even any outpatient psychotherapy or counseling sessions," and that "[n]o examining had issued a P.E.C."  (Tr. 25).

Claimant particularly takes issue with the ALJ's statement that no treating or examining physician had issued a PEC, citing authority from the Seventh Circuit that an ALJ is not competent to make such statement.[4]  [rec. doc. 13, p. 3, n. 4].  This case is non-binding on this

---

[4]Claimant cites *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015), in which the Court observed: "The administrative law judge went far outside the record when he said that if Voigt were as psychologically afflicted as Day thought, he 'would need to be institutionalized and/or have frequent inpatient treatment'– a medical conjecture that the administrative law judge was not competent to make, *see Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir.2014); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir.2014); *Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir.2009), and that was implausible to boot. The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves."

Court, and has not been cited as persuasive authority in any reported case within the Fifth Circuit.

In any event, it is well established in the Fifth Circuit, as well as other Circuits, that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Chester v. Callahan*, 193 F.3d 10, 12 (1st Cir. 1999) (gaps in the medical record regarding treatment can constitute "evidence" for purposes of the disability determination); *McGuire v. Commissioner of Social Security*, 178 F.3d 1295 (6th Cir.1999) (gaps in treatment may reasonably be viewed as inconsistent with a claim of debilitating symptoms); *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling condition).

Here, the ALJ noted that claimant received minimal medical treatment and did not seek any mental health treatment prior to September 30, 2009, his DLI.  (Tr. 25).  She further observed that Dr. Cousin did not advise claimant to undergo any mental health treatment prior to this date, and that claimant did not even seek medical treatment for a couple of years after expiration of his insured status.  In conclusion, the ALJ stated that she "[could] not ignore the fact that claimant sought very little, if any, medical treatment for his allegedly disabling impairments.  It is reasonable to believe that if claimant's impairments were as severe and disabling as alleged, he would have sought regular medical treatment."  (Tr. 25).  The undersigned agrees.

Further, claimant argues that the ALJ failed to discuss Dr. Cousin's prior undated medical source statement.  (Tr. 655-58).  The undersigned notes that this undated statement is part of

Exhibit 13-F, which the ALJ specifically discussed.  Regardless,  "Procedural perfection in administrative proceedings is not required."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988); *see also Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (applying harmless error analysis in the disability benefits context).  The fact remains that claimant's treating physician did not recommend mental health treatment until after claimant's DLI.  Thus, any error by the ALJ in not specifically citing this undated report was harmless.  *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (finding harmless error where claimant failed to seek mental health care).

Regarding the May 14, 2013 medical source statement, the ALJ assigned "some weight" to this assessment, but noted that Dr. Cousin did not treat claimant from November, 2012 through May, 2013, when the assessment was rendered.  (Tr. 22).  She noted that, furthermore, these dates were significantly after the expiration of claimant's date last insured.  She also recognized that claimant had not initiated any formal mental health treatment.

This case is similar to *Carey v. Apfel*, 230 F.3d 131 (5th Cir. 2000).  While Carey's case was pending before the Appeals Council, he submitted additional evidence in the form of a 1997 letter from a physician who had treated him at the time of his injury, but had not seen him regularly since.  *Id*. at 141 n.1.  The ALJ found that the letter did not present any basis for reversing the ALJ's decision for several reasons.  First, the Court noted that the letter was drafted after the ALJ's decision and related to Carey's current condition, rather than his condition in 1991 (DLI).  Of equal importance, the Court noted that the letter did  not purport to set forth any clinical findings, but merely recounted claimant's current characterization of his impairments and then concluded that claimant, in the opinion of the physician, was disabled.  The Court further

16

observed that: "Assuming *arguendo* that the 1997 letter is relevant, its probative weight is minimal and does not undermine the ALJ's decision in this case. See 20 C.F.R. § 220.46 (d) ("A treating physician is a doctor to whom the claimant has been going for treatment on a continuing basis"; "medical evidence provided by a treating physician will be considered," but a "statement by or the opinion of the claimant's treating physician will not determine whether the claimant is disabled.")."

Like *Carey*, the ALJ noted that Dr. Cousin filled out the Medical Source Statement *five years* after the expiration of claimant's insured status.  (emphasis added).  Additionally, the statement did not set forth any clinical findings in support of claimant's condition, but merely check-marked his answers on the form and then concluded that claimant was disabled. Had the ALJ heavily relied on Dr. Curtis' opinion, such reliance would have been in error because his responses to the questionnaire were conclusory and without explanation.  *See Giles v. Astrue*, 433 F. App'x 241, 247 (5th Cir. 2011).

Appellate courts, including the Fifth Circuit, have often held that checklist opinions are unworthy of credence when they are not adequately supported by or are inconsistent with the medical records.  *Heck v. Colvin*, 2016 U.S. Dist. LEXIS 96678, at *37-38 (E.D. La. Apr. 6, 2016) (*citing Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011) ("[T]he 'questionnaire' format typifies 'brief or conclusory' testimony. . . . [W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations, [the treating physician's] opinion is given little weight.'"); *Peck v. Barnhart*, 214 F. App'x 730, 738 (10th Cir. 2006) (ALJ provided legitimate reasons for rejecting doctor's opinion consisting "of checked boxes and circled numbers on a form" when the

17

"opinion was not supported with additional explanation" nor justified by the treatment notes);

*Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001) ("the checklist format, generality,

and incompleteness of the assessments limit their evidentiary value"); *Johnson v. Apfel*, 189 F.3d

561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form when it was

contradicted by evidence in the record); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)

(quotation omitted) ("Form reports in which a physician's obligation is only to check a box or fill

in a blank are weak evidence at best. . . . [When] these so-called reports are unaccompanied by

thorough written reports, their reliability is suspect . . . ."); *Frey v. Bowen*, 816 F.2d 508, 515

(10th Cir. 1987) ("Such evaluation forms, standing alone, unaccompanied by thorough written

reports or persuasive testimony, are not substantial evidence.").  Thus, the ALJ was entitled to

give this opinion lesser weight.

Further, the ALJ correctly determined that the disability issue was reserved for the

Commissioner.  It is well established that "the ALJ has sole responsibility for determining a

claimant's disability status."  (emphasis added).  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir.

2000) (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).  Whether an impairment is

disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the

evidence.  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Carrier v. Sullivan*, 944

F.2d 243, 247 (5th Cir.1991).  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)

("[a]mong the opinions by treating doctors that have no special significance are determinations

that an applicant is 'disabled' or 'unable to work.'  20 C.F.R. § (3)(1).  These determinations are

legal conclusions that the regulation describes as 'reserved to the Commissioner.'").  Further, the

ALJ is free to reject the opinion of any expert when the evidence supports a contrary conclusion.

*Id.* Thus, it was within the province of the ALJ to give less weight to Dr. Cousin's opinion, which was rendered five years after his insurance status expired.

Claimant also argues that the ALJ failed to apply the six factors listed in 20 C.F.R. §§ 1527 and 416.927 required for rejecting a treating physician's opinion.  Under these statutes, "an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (*citing Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

However, this rule applies only if the ALJ declines to give *any* weight to the treating physician's opinion.  *Newton*, 209 F.3d 456.  In *Newton*, the Court held that, *"absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist*, an ALJ may *reject* the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)(5)§ 404.1527(c)(5)."

Here, the ALJ gave "some" weight to Dr. Cousin's opinion.  (Tr. 20).  Additionally, she relied on medical evidence from other physicians to controvert the treating physician's opinion. For example, the ALJ gave "great weight" to the state agency psychological consultant, Dr. Ray, as it was consistent with the objective evidence of record for the period prior to September 30, 2009.  (Tr. 19).  Additionally, she gave "great weight" to the overall opinion of the examining consultative physician, Dr. Greenway, as it was supported by the objective evidence as a whole for the period on and before September 30, 2009.  (Tr. 21).  Regarding Dr. Friedberg, the ALJ

gave "little weight" to her opinion, as no objective findings were documented to justify her

conclusion.  (Tr. 21).  The ALJ noted that no formal mental health intervention was ever ordered

or initiated on or before September 30, 2009.

Further, the ALJ considered that Dr. Cousin was a family practitioner, and not a mental

health care specialist.  (Tr. 20-22).  "The opinion of a specialist generally is accorded greater

weight than that of a non-specialist."  *Newton*, 209 F.3d at 455 (*citing Paul v. Shalala*, 29 F.3d

208, 211 (5th Cir. 1994)); 20 C.F.R. § 404.1527§ 404.1527(c)(5) ("We generally give more

weight to the opinion of a specialist about medical issues related to his or her area of specialty

than to the opinion of a source who is not a specialist.").  The Commissioner may give less

weight to a treating physician's opinion about a condition outside his area of expertise.  *Giles v.*

*Astrue*, 433 F. App'x 241, 246 (5th Cir. 2011).  Thus, the ALJ's decision to give more weight to

the opinions of Drs. Ray and Greenway, who are mental health care specialists, is entitled to

deference.

Additionally, claimant asserts that he did not seek regular treatment because he could not

afford it.  [rec. doc. 13, p. 3].  The ALJ recognized that free sources were available to indigents.

(Tr. 25).  In the Fifth Circuit, the rule is that if the claimant cannot afford the prescribed medical

treatment or medicine, *and can find no way to obtain it*, the condition that is disabling in fact

continues to be disabling in law.  (emphasis added).  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th

Cir. 1987).

Claimant cites SSR 82-59, which provides that one of the justifiable causes for failure to

follow prescribed treatment is that "[t]he  individual is unable to afford prescribed  treatment

which he or she is willing to accept, but for which free community resources are *unavailable*."

(emphasis added).  Here, however, claimant sought treatment in an area where free medical care is available.  Additionally, Dr. Cousin was helping claimant fill out papers for free samples from pharmaceutical companies.  (Tr. 638).  Thus, this argument lacks merit.

Finally, claimant asserts that the ALJ's RFC failed to account for Dr. Ray's opinion that claimant could not perform or sustain social interaction (*i.e.*, he was markedly limited), because the RFC allowed for contact with the public up to one-third of the workday.  [rec. doc. 13, p. 5]. In assessing claimant's social functioning prior to his DLI, the ALJ found that claimant had moderate difficulties.  (Tr. 23, 26).  She noted that claimant preferred to isolate himself from crowds.  However, he socialized with his brother and other family members, as well as several friends with whom he consumed beer and for whom he did small engine repair work. Additionally, she observed that he was able to effectively communicate, both orally and in writing.  This is confirmed in the report of Dr. Greenway, who observed that claimant had good social functioning with his parents, brother, and family members, and exhibited adequate social skills.  (Tr. 572, 574).  As the ALJ's RFC finding is supported by the evidence, it is entitled to deference.

## IV. CONCLUSION

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy

thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 9th day of August, 2016, at Lafayette, Louisiana.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**